FILED
2023 Jul-11  PM 02:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| ERIKA PERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:21-cv-00267-JHE |
| | ) | |
| IMPACT FAMILY COUNSELING, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION[1]

Through her second amended complaint ("SAC"), Plaintiff Erika Perry ("Perry" or "Plaintiff") brings this employment discrimination action against Defendant Impact Family Counseling ("Impact"), alleging race discrimination and retaliation.  (Doc. 12).  Impact moves for summary judgment on all of Perry's claims against it.  (Doc. 31).  Perry has filed a response in opposition (doc. 43), and Impact has filed a reply in support of its motion (doc. 48).[2]  For the reasons discussed below, the motion for summary judgment is **GRANTED**.

### I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56 "mandates the entry of summary judgment, after adequate

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment.  (Doc. 16).

[2] Impact has also moved to strike portions of Perry's affidavit in opposition to summary judgment (doc. 44), which Perry opposes (doc. 49).  The undersigned has addressed that motion separately by construing it as a series of evidentiary objections and ruling on those objections.

time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323.  The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish there is a "genuine issue for trial." *Id.* at 324.  (citation and internal quotation marks omitted).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor).  Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts.  *See Pace v. Capobianco*, 283 F.3d 1275, 1276–78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)).  Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Summary Judgment Facts[3]

Impact is a 501(c)(3) nonprofit counseling agency.  (Affidavit of LeCrecia Day (doc. 34-1, "Day Aff.") at ¶ 3).  It provides counseling services to "at risk" youth and their families in Birmingham, Alabama.  (*Id.*).  Impact is funded by a number of sources, including grants, contracts with schools, donations, and program fees.  (Deposition of George Casey (doc. 34-2, "Casey Depo.") at 14 (45:9–46:14)).

At Impact, employees commonly work on multiple grant-funded programs.  (Casey Depo. at 18 (63:17–20)).  Impact's employees "wear multiple hats" and are cross-trained to allow them to work wherever there is a need.  (*Id.* at 18–19 (63:21–64:3, 64:22–65:2)).  Impact employees' salaries are determined by a number of factors, such as market value and the funding source for the programs on which they work.  (*Id.* at 14 (47:8–18)).  Employees receive a single salary, although it may be partially funded by multiple grants; for example, an employee might work on three grants, spend a third of her time on each grant, and receive partial salary funding from each grant.  (*Id.* at 54:9–19).  Impact's directors—Financial Director/Mentoring Director LaCrecia Day ("Day," African American female), Executive Director George Casey ("Casey," Caucasian male), and Amie Cheri Hunter ("Hunter," Caucasian female)[4]—determined which employees would work on which grant program.  (Deposition of Erika Perry (doc. 34-3, "Perry Depo.") at 12 (37:9–

---

[3] Taking into account the undersigned's rulings on Impact's objections, these "summary judgment facts" are undisputed or, if disputed, taken in a light most favorable to Perry.  Where a purported dispute is not genuine or material, the undersigned has addressed the matter in a footnote.

[4] Hunter's name is spelled "Sheree Hunter" in Perry's deposition.  (*See, e.g.,* doc. 34–3 at 41 (151:10)).  The undersigned takes any such references as references to Hunter.

12), 16 (51:4–6), 29 (104:5–7); Day Aff. at ¶¶ 2, 4; Declaration of Erika Perry (doc. 43-1 ("Perry Decl.") at ¶ 6).[5]

### A. Perry's Employment with Impact

Perry (African American female) began working at Impact as an intern in Spring 2010 while still in school at the University of Alabama Birmingham ("UAB"). (Deposition of Erika Perry (doc. 34-3, "Perry Depo.") at 6 (13:10–16)). Impact initially hired Perry as a case manager on the Mentoring Children of Prisoners program. (Casey Depo. at 15 (52:1–7); Perry Depo. at 6– 8 (13:8–22, 15:23–16:8, 19:20–21)). Perry became a program coordinator for the Teen Mom program once the Mentoring Children of Prisoners grant ended. (Perry Depo. at 8–9 (19:20–20:20, 21:21–22:4)).

Perry eventually worked for three total programs: the Teen Mom program, the Cribs for Kids program, and the UAB SafeCare program. (Perry Depo. at 9–10 (23:21–24:7, 25:20–26:11, 27:22–28:3); Day Aff. at ¶ 17; Casey Depo. at 17 (60:13–22), 21 (74:22–75:22)). Perry's salary was covered by all three of these grants, and a percentage of her time was allocated to each of them. (Casey Depo. at 17 (60:13–22), 21 (74:22–75:22)). For the Teen Mom program, Perry provided services in schools with high rates of teen pregnancy, schools from whom Impact

---

[5] The facts section of Perry's brief cites generally to her declaration rather than any individual paragraph. (*See* doc. 43 at 1–19). This contravenes the undersigned's initial order, which states: "A specific reference [to evidentiary material] must include the exhibit number, page, and when appropriate, the line number." (Doc. 17 at 7). It also violates Rule 56(c)(1)(A), which requires a party disputing a fact through a reference to other record evidence to support it by "citing to *particular parts* of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A) (emphasis added). Nevertheless, the undersigned has attempted to locate which portions of the declaration align with Perry's purported factual disputes.

received referrals, and schools Impact solicited to engage with the program.  (Perry Depo. at 13 (40:8–15); Day Aff. at ¶ 11; Perry Decl. at ¶ 7).  For the Cribs for Kids program, Perry conducted safety training on safe family and child sleeping habits, provided cribs, and conducted follow-ups. (Perry Depo. at 14 (42:7–43:11)).  Perry conducted trainings either at the schools the mothers attended or at an Impact office.  (*Id.* (43:17–44:1)).  Perry also delivered cribs to mothers' homes or to the schools they attended; she "would give out hundreds of cribs."  (Perry Depo. at 14–15 (43:12–16, 44:17–20, 48:2–4)).  The UAB SafeCare program involved serving pregnant individuals by providing parenting and safety skills.  (Perry Depo. at 16 (52:3–22); Perry Decl. at ¶ 8).  Perry also visited these individuals, although the visits could be conducted in person or via teleconference or videoconference.  (Perry Depo. at 16 (52:12–15); Perry Decl. at ¶ 8).

### B. Impact's COVID-19 Exposures

In March 2020, Impact closed its offices due to the COVID-19 pandemic.  (Day Aff. at ¶ 21).  Impact informed its full-time employees that they needed to take leave and/or work from home until further notice.  (*Id.*; Perry Depo. at 118 (Exh. 4)).  Perry was able to meet with clients only by video conference or phone and not in person, which was a challenge since many of Impact's programs rely on face-to-face contact.  (Day Aff. at ¶ 21; Perry Depo. at 39 (145:4–14)).  Perry continued to make limited or "no-contact" home deliveries for the Cribs for Kids program and the UAB SafeCare program and met with clients through videoconference or by phone; group meetings and other meetings could also occur through teleconference or videoconference.[6]  (Perry Decl. at ¶ 9–10).

─────────────────────

[6] Day indicated that "many" of Perry's job duties could not be performed remotely, including in this list "the facilitation of group meetings, delivery of resources to clients, and

In early May 2020, the Impact offices began to reopen. (Perry Depo. at 40 (147:15–23), 119 (Exh. 5)). Perry and other African American Impact employees were asked to return to Impact's Vestavia Hills office to assist with the building's remodeling; non-African American employees were not asked to assist. (Perry Decl. at ¶ 11). All other work was remote at this point. (*Id.*). Therapists, who also relied on consultations and group meetings, were allowed to continue working from home, and Impact purchased new MacBook computers for them to ease the burden of working remotely. (*Id.*). However, on May 22, 2020, Hunter sent an email to Impact employees (including Perry) asking them "to resume their work responsibilities in the office" starting May 26, 2020. (Perry Depo. at 122–24 (Exh. 5)). The email offered employees the following options:

- Return to work starting May 26th 8:00–5:00 (office is closed Monday, May 25th for Memorial Day)

- For those individuals who feel uncomfortable resuming work in the office they can submit a Leave Request and use any, Annual, Sick, Personal Days (PTO). We are working to get you a summary of your available time.

- For those individuals without PTO they can use Leave Without Pay.

- This was not originally discussed on our Zoom call this morning, however, another option that is available is transitioning into an Independent Contract Therapist (ICT). Independent Contract Case Manager, etc. role. ICT's, Independent Contractors, have the ability to work from multiple environments, such as home doing teletherapy, since IMPACT does not dictate how and where that service is performed. This may be a good option for anyone who feels unsafe to return to our office environment.

- Anyone that feels unsafe to return to work is free to choose not to work and submit their resignation.

---

meetings at program site." (Day Aff. at ¶ 22). Perry testified each of these specific examples could be performed remotely. (Perry Decl. at ¶ 9–10). Casey testified Day had "shared with [him] that [Perry] had duties that were not being done and we really wanted . . . Perry to come back and do them." (Casey Depo. at 44 (165:6–9)). For summary judgment purposes, the undersigned assumes Perry's work could be done remotely.

(Perry Depo. at 124 (Exh. 5)).  Impact did not allow any employees to work from home permanently.  (Day Aff. at ¶ 23).  Perry spoke with Day about the option to transition to independent contractor, but she did not ultimately pursue it or any of the other alternative options.[7]  (Perry Depo. at 41 (151:19–152:1, 153:6–11)).

In mid-2020, one or more Impact employees was exposed to COVID-19 and eventually tested positive.[8]  (Day Aff. at ¶ 25; Perry Decl. at ¶ 13).  Perry learned that she had been exposed to at least two employees who tested positive.  (Perry Decl. at ¶ 14).  Hunter forwarded an email to Impact's staff on July 5, 2020, indicating that all staff were required to get tested and provide documentation to Impact.  (Day Aff. at ¶ 25; Perry Depo. at 40 (148:16–149:10),  125–26 (Exh. 6)).  Perry reported she was tested on June 30, 2020.  (Day Aff. at ¶ 26; Perry Depo. at 127 (Exh. 7)).

**C. Perry Declines to Return to Work**

About a week later, nearly all employees' test results had come back and they had resumed working from the office, but Perry had not returned to on-site work.[9]  (Perry Depo. at 43 (158:14–21), 128–29 (Exh. 8); Casey Dep. at 41 (154:9–14), 43 (161:12–15); Day Aff. at ¶ 25).  Day

---

[7] Perry purports to dispute portions of Impact's reopening plan, relying on Paragraphs 11 and 12 of her declaration.  (Doc. 43 at 3–4).  The allegations in Paragraph 11, which have been reproduced entirely above, are not inconsistent with the reopening plan as described in Hunter's May 22, 2020 email.  Furthermore, Impact's objections to portions of Paragraph 12 have been sustained and they are not competent summary judgment evidence here.

[8] Perry contends exposure occurred "as early as late May 2020" and that she learned of the outbreak only from a coworker.  (Doc. 43 at 4–5; Perry Decl. at ¶ 13).  Day states the outbreak occurred in late June or early July 2020."  (Day Aff. at ¶ 25).  Either way, it is undisputed that this took place in mid-2020.

[9] For logistical reasons, Perry's test was administered at a different location than other Impact employees' tests.  (Perry Decl. at ¶¶ 15–16).

followed up with Perry and Perry reported that she had not received her results.[10]  (Day Aff. at ¶¶ 26; Perry Depo. at 18 (58:6–9), 137, 139, 143, 147 (Exh. 12)).  Day suggested Perry follow up in different ways (e.g., going to the office and asking about the test).[11]  (Day Aff. at ¶ 27; Perry Depo. at 47 (174:7–21), 132 (Exh. 11); Casey Depo. at 40 (152:14–19)).  Day also attempted to get Perry to take a screenshot of the testing office's online portal to show where the results would be placed, but Perry sent screenshots of the "Sent Messages" tab and not the "Inbox" tab (which Day specifically requested).  (Day Aff. at ¶ 27; Perry Depo. at 143–47 (Exh. 12)).

On July 14, 2020, Casey asked about the status of Perry's test results; she informed him that she would not return to work until receiving those results.[12]  (Perry Depo. at 18 (59:13–14, 59:22–60:1, 61:9–11), 141 (Exh. 12)).  Perry told Casey she had been quarantining according to CDC guidelines for over fourteen days since her June 30, 2020 COVID-19 test.[13]  (Perry Depo. at 43 (159:9–14), 45 (167:2–6); Casey Dep. at 40 (149:14–18)).

---

[10] Perry indicates this fact is disputed because of her differing testing location.  (Doc. 43 at 5).  This contention explains why Perry had not received her results but does not actually raise a genuine factual dispute as to whether she reported to Day that she had not received them.

[11] Day testified Perry did not follow up with her testing results.  (Day Aff. at ¶ 27).  Perry disputes that she did not follow up on the basis that she "did take proactive steps" to secure her result, but it was nevertheless delayed.  (Doc. 43 at 5–6).  Although Perry does not describe these "proactive steps," the undersigned resolves this dispute in her favor.  Perry also states she had been exposed to sick Impact employees and she was "symptomatic" with symptoms common to COVID-19.  (*Id.*).  The undersigned has found the portions of Perry's declaration including claims about Perry's symptoms should be excluded due to the sham affidavit doctrine, and in any case her symptoms do not address whether she followed up to obtain her test results.

[12] Perry again disputes this by referencing her allegations of COVID-19 exposures and symptoms.  (Doc. 43 at 6).  This is not a dispute with the substance of the factual claim here, but a justification for not returning to work.

[13] The parties dispute whether Perry actually quarantined.  Day testified she noticed posts on Perry's Facebook page indicating Perry conducted a meeting in Impact offices after hours with a group from her separate nonprofit, was around others, and engaged in other work.  (Day Aff. at

On July 16, 2020, Casey informed Perry by phone and email that she would need to return to work by July 20, 2020 per CDC guidelines providing for a return to work after completing a fourteen-day quarantine.  (Perry Depo. at 43–44 (161:2–4, 164:8–19), 130 (Ex. 9); Day Aff. at ¶ 28).  Day reminded Perry the next day that she was expected to return by July 20 and that she would need to bring a letter from her testing physician's office stating that they had not received her results.  (Day Aff. at ¶ 28; Perry Depo. at 132 (Exh. 11)).  Perry provided Day with the login credentials to her online profile so that Day could access the profile herself and see whether the test results were available.  (Perry Decl. at ¶ 19).

Perry did not return to work on July 20, 2020.  (Day Aff. at ¶ 29; Perry Depo. at 47 (174:22–175:2); Casey Depo. at 34 (126:20–127:3)).  After visiting the emergency room and her primary physician for back pain, Perry provided a note to Day and Casey excusing her from work to take physical therapy.[14]  (Perry Depo. at 19 (64:2–13), 43 (159:15–160:2)).

---

¶ 30, 12–16 (Ex. A)).  Perry denies she met with any groups and insists she quarantined.  (Perry Decl. at ¶ 18).

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Baxter v. Roberts*, 54 F.4th 1241, 1253 (11th Cir. 2022) (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)).  Although photographic evidence might ordinarily override contradictory testimony, the complication here is that the only reason to associate the Facebook photos in Day's exhibit with Perry or Perry's nonprofit is Day's claim that they are associated.  While it is possible other evidence would support Day's contention (e.g., evidence that "Youth Talk United," which appears to be the organization Day contends is Perry's nonprofit, is operated by Perry), none of that appears in the record.  Therefore, for summary judgment purposes, the undersigned will assume Perry quarantined as she stated.

[14] Perry contends "her doctor instructed her not to return to work." (Doc. 43 at 7).  Perry's declaration implies this was because of COVID-19 exposure and her symptoms.  (*See* Perry Decl. at ¶¶ 20–21).  The undersigned has separately sustained Impact's objections to newly-asserted claims in Perry's declaration of fever, headaches, and fatigue.  Excluding those symptoms, Perry experienced lightheadedness and back pain, which she believed may have been symptoms of

On July 22, 2020, Casey and Day called Perry.  (Perry Depo. at 47 (176:18–20)).  During this phone call, Perry reiterated that she was unwilling to return to work at that time.[15]  (Casey Depo. at 39 (148:12–21)).  Casey and Day communicated to Perry that Perry was being laid off in light of budgetary concerns.  (Perry Depo. at 17 (56:22–57:2), 19 (64:14–65:2), 151 (Exh. 13); Casey Depo. at 44 (166:13–18)).  Perry was selected for layoff because she would not return to work.  (Day Aff. at ¶ 31; Casey Depo. at 44–45 (167:5–18, 169:21–170:17)).  Casey and Day testified that Impact had a tight budget at the time and Impact was not sure where it would stand

---

COVID-19.  (Perry Depo. at 43 (159:15–160:2)).  Perry's back pain prompted her to visit the emergency room, where she was told that she did not have COVID-19 and instead had back spasms.  (*Id.* at 43–44 (160:11–16, 162:19–163:5).  Perry testified she then saw her primary care doctor, who gave her "an excuse from work for at least a week to take physical therapy for the pain and anxiety and the spasms that I was having."  (*Id.* at 19 (64:2–6)).  Perry further testified her communications with Casey and Day "included stating, okay, yes, you are rushing me and saying I need to come I don't have, but I have been so long thinking I have Covid, went to the doctor and found out these are the things that I'm having . . . ."  (*Id.* (64:7–13)).  In other words, the evidence supports that although Perry may have previously believed she had COVID-19 before this time, her visits to the E.R. and her primary care physician cleared up this misconception.

It is unclear whether Perry is referencing this (and she does not cite it), but there is another note in the record.  This note is dated July 15, 2020 and indicates Perry took another COVID-19 test on that date and "may discontinue home isolation under the following conditions: Your COVID-19 test returns negative and you have had a resolution of fever without the use of fever reducing mediations and improvement in respiratory symptoms (cough, shortness of breath)."  (Perry Depo. at 149 (Exh. 12)).  Perry sent this to Day by text message the same day.  (*Id.* at 148–149 (Exh. 12)).  The undersigned does not believe this is the note Perry references for several reasons.  First, the context of this conversation indicates that Perry sent this message in response to Day's request that Perry "[s]end me your slip showing you got retested and I'll submit it to [Casey]," not to indicate that she was quarantined by doctor's orders.  Second, this note is from an urgent care clinic; Perry testified that "her primary doctor" gave her the physical therapy note (Perry Depo. at 19 (64:2–6)), and the note she references in her declaration is from "[her] physician" (Perry Decl. at ¶ 20–21).  Finally, the treating physician's note is the one referenced in the SAC.  (Doc. 12 at ¶¶ 63–64).

[15] Perry claims to dispute this fact, denying that she "refused to return to work" (a quotation that does not appear in Impact's paragraph) and citing her doctor's instructions "not to return to work."  (Doc. 43 at 7).  This actually demonstrates the fact is undisputed; Perry simply argues she had a good reason for not returning to work.

10

financially if schools did not reopen.  (Day Aff. at ¶ 31; Ex. 2, Casey Depo. at 47–48 (180:22–181:5, 181:19–182:1)).  According to Day, Impact felt that laying Perry off was an appropriate place to begin budget cuts due to her failure to return to work.[16]  (Day Aff. at ¶ 31).  Perry did not receive a severance package.  (Perry Decl. at ¶ 30f).

### D. Perry's Allegations of Race Discrimination

#### 1. Conditions of Employment (Pay, Duties, Benefits)

Perry alleges she received less pay and benefits and had more duties than Caucasian Impact employees.  Perry also contends some Caucasian employees received a severance when they separated from Impact, while she did not.  (Doc. 12 at ¶ 72).

Perry contends she was not permitted to work from home, but Lindsay Brown ("Brown," Caucasian female) and Beth Black ("Black," Caucasian female) were permitted to do so.  (Doc. 12 at ¶¶ 62, 74; Perry Depo. at 29–30 (105:21–106:2); Perry Decl. at ¶¶ 26a-b; Casey Depo. at 47 (177:20–178:5)).  Perry testified she did not know Brown's workload or schedule.  (Perry Depo. at 29–30 (106:6–8,18–20, 108:2–4, 109:1–11)).  Brown's supervisors were Hunter and Casey.  (*Id.* (106:18–20)).  Brown had originally worked on the Teen Moms program, but had at some point transitioned to the Schools Program; Perry guessed this involved Brown "talk[ing] to them one on

---

[16] Perry disputes portions of Impact's rationale for laying her off (but not that she was laid off, as discussed further in the order on Impact's evidentiary objections).  (Doc. 43 at 7–8).  Perry primarily points to her understanding of Impact's finances and of Casey's salary.  The undersigned has sustained Impact's objections to portions of Perry's declaration on the basis that she does not have personal knowledge of either of these things.  Perry also indicates Impact received two six-figure Paycheck Protection Program loans, but her citation for this is an article from the Montgomery Advertiser rather than the summary judgment record.  Perry does not offer any argument supporting it is appropriate to take judicial notice of these loan amounts.  Finally, Perry states that the grants for the Teen Mom, Cribs for Kids, and UAB SafeCare programs provided her full salary.  (Perry Decl. at ¶ 24).  This fact appears above, and the undersigned will consider it appropriately below.

one . . . about their behavioral issues." (*Id.* (107:21–108:11)). Black was "over the Tanner Program," was considered to be a coordinator, and supervised several employees. (*Id.* at 34–35 (125:16–126:14)). Casey testified Black's duties were comparable to Perry's. (Casey Depo. at 47 (179:3–6)).

Perry also contends she was paid less than her Caucasian coworkers. (Doc. 12 at ¶¶ 26, 41–42, 101, 106–07). According to Impact's records, as of July 2020, Perry was the sixth-highest paid employee at Impact (excluding the three Directors). (Day Aff. at 17–21 (Exh. B), ¶ 32).[17] Of the non-Director employees making more than Perry, only two were Caucasian: Brown and Sarah Hart ("Hart").[18] (Day Aff. at 17–21 (Exh. B), ¶ 32). Impact generally pays licensed staff on higher pay scales than non-licensed staff. (Day Aff. at ¶ 32). Perry was not a licensed counselor or therapist while working at Impact. (*Id.*).

Perry's other pay, duty, and benefits comparators were paid less than her and/or had different job titles and roles within Impact:[19]

---

[17] Perry disputes this on the basis that Day has only provided pay information from September 2014. (Doc. 43 at 11). Day has indeed provided this information, but it is Exhibit C to her affidavit—not Exhibit B, where July 2020 pay information appears. That said, Impact provides no explanation for why in other paragraphs, it uses some pay information from July 2020 and some from September 2014. These unexplained references to September 2014 pay (years before the events of this case) do not appear material to the facts here in the absence of some sort of explanation, so the undersigned has not considered them. The remainder of Perry's "dispute" of this fact is irrelevant argument concerning Casey's refusal to disclose his pay, Impact's failure to provide Perry a pay raise, and Impact's use of Perry's skills and experience.

[18] The other three higher-paid employees—Brandon Battle, Shareta Collins, and Jasmine Stinson—are African American. (Day Aff. at ¶ 32).

[19] Perry purports to dispute this on the basis that "there are sufficient similarities" between herself and her comparators for Title VII purposes. (Doc. 43 at 11). The appropriateness of each comparator is addressed below, but this has nothing to do with the *facts* of their jobs and salaries. Perry also states each of these comparators (apart from intern Sussie Williams) was paid more than she was. (Doc. 43 at 12–13). The undersigned has sustained under the sham affidavit doctrine

- Brown was a school counselor.  (Perry Depo. at 30 (108:1–4); Casey Depo. at 54 (205:15–16)).  Brown received more pay than Perry because she is a state-licensed Professional Counselor/Therapist.   (Day Aff. at 17–21 (Exh. B), ¶ 32).   Perry's declaration indicates Brown "held fewer responsibilities and duties than [Perry] did at the time."  (Perry Decl. at ¶ 27c).  Perry did not know Brown's responsibilities beyond teaching "the youth . . . talk[ing] to them one on one, I guess, about their behavioral issues similar to me going into the schools."  (Perry Depo. at 30 (108:5–11)).  Perry did not know Brown's schedule, details about the program Brown worked on, or how many children she was responsible for beyond "probably . . . few during the Covid time." (*Id*. (108:16–109:9)).  Perry testified both she and Brown had a similar duty of going "into the schools."  (*Id.* (108:12–15)).

- Sheena Patton ("Patton," Caucasian female) was a receptionist and office manager. (Perry Depo. at 31 (110:6–10); Casey Depo. at 54 (206:1–2)).  Perry testified she did not know how much Patton was paid.  (Perry Depo. at 31 (110:6–10, 111:14–15)). Perry's declaration indicates Patton "had fewer responsibilities and fewer job duties than [Perry] did at the time."   (Perry Decl. at ¶ 27d).  Patton left Impact during the pandemic and was offered a severance package.[20]  (*Id.* at ¶ 26d).

- Ashley Crowe ("Crowe," Caucasian female) was a therapist.  (Perry Depo. at 31 (113:21–23); Casey Depo. at 54 (206:6–7)).  Perry testified she did not know Crowe's

---

Impact's objections to portions of Perry's declaration stating each of her comparators was paid more than her.  As noted in that order, Perry repeatedly testified she did not know what her comparators were paid.

[20] Impact contends Patton did not receive a severance package.  (Day Aff. at ¶ 36).

pay.  (Perry Depo. 32 (114:2–3, 115:20–22)).  Perry's declaration indicates Crowe "had fewer responsibilities and fewer job duties than [Perry] did at the time."  (Perry Decl. at ¶ 27e.  Perry was unaware of what grants Crowe worked on, but Perry knew she "read a lot in the office" at Impact's Vestavia branch.  (Perry Depo. at 32 (114:4–11)). Crowe received severance pay after she chose to leave Impact.  (Perry Decl. at ¶ 26c).

- Kelsey Aiken,[21] ("Aiken," Caucasian female) is a schools case manager who was paid less than Perry.  (Day Aff. at 18 (Exh. B), ¶ 34).  Perry's declaration indicates Aiken "had fewer responsibilities and fewer job duties than [Perry] did at the time."  (Perry Decl. at ¶ 27f).  Perry did not know details about Aiken's job apart from being told that Aiken was "over a program in Vestavia."  (Perry Depo. at 36 (130:13–17)).

- Hunter was Impact's Clinical Director and Chief Operating Officer.  (Casey Depo. at 20  (69:11–13)).   Perry's  declaration  indicates  Hunter  "had  fewer  or  similar responsibilities and duties than [Perry] did at the time."  (Perry Decl. at ¶ 27b).  Perry testified she did not know the job duties of Impact's directors beyond supervising employees, stating: "That's their information, I don't know what all they were doing." (Perry Depo. at 29 (104:5–19)).

- Hart is the Coordinator of Impact's Birmingham City Schools division of the Schools program.  (Day Aff. at ¶ 32).  Hart received more pay than Perry because she is a state-

---

[21] Kelsey Aiken appears to be referenced in the SAC as "Kelsey 'Smith.'"  (*See* doc. 12 at ¶ 113(e)).  Casey testified that Perry "ha[s the name] wrong on the documentation" (although he referred to her as Kelsey "Aikens").  (Casey Depo. at 49 (188:16–21)).  Internal emails at Impact list her as "Kelsey Aiken."  (*See, e.g.,* Perry Depo. at 128 (Exh. 8)).  Thus, the undersigned considers references to Kelsey Smith, Kelsey Aiken, and Kelsey Aikens to be references to the same person.

14

licensed school therapist, managed a team of therapists and case managers, and coordinated the Birmingham City Schools division of the Schools program. (Day Aff. at 17–21 (Exh. B), ¶ 32). Perry's declaration indicates Hart "had fewer or similar responsibilities and duties as [Perry] did at the time." (Perry Decl. at ¶ 27e). Perry did not know specifically what Hart's job responsibilities were. (Perry Depo. at 37 (137:7–9)).

- Sussie Williams was an unpaid intern. (Day Aff. at ¶ 34). Perry did not know specifics about Williams' job. (Perry Depo. at 38 (138:7–12)).

- Black was, like Perry, a program coordinator. (Perry Depo. at 35 (126:2–4); Casey Depo. at 47 (178:19–179:6)). Black was paid less than Perry. (Day Aff. at 18 (Exh. B)). Perry's declaration indicates Black "had fewer or similar responsibilities and duties as [Perry] did at the time." (Perry Decl. at ¶ 27h). Casey testified Black's duties were comparable to Perry's. (Casey Depo. at 47 (179:3–6)).

Perry also contends she received less paid leave than Crowe, Brown, and Patton. (Doc. 12 at ¶ 46; Perry Depo. at 29 (105:5–12)). However, Perry testified she did not know how much paid leave these coworkers took or had available to them. (Perry Depo. at 29 (105:13–14), 31 (110:11–18, 111:16–18)). Day testified Perry did not in fact receive less paid leave than they did. (Day Aff. at ¶ 35).

Perry alleges the following other examples of unequal job duties and benefits:

- She was exclusively assigned to work with schools with a predominately African American population and received fewer resources from Impact to address that work than Impact employees working with Caucasian populations (doc. 12 at ¶ 21; Perry Decl. at ¶ 30c). Casey testified program funding is determined by the entity that

15

provides the grants.  (Casey Depo. at 15 (50:20–51:7)).  Impact partners with schools based on need, such as high rates of teen pregnancy or referrals.  (Day Aff. at ¶ 11; Casey Depo. at 49–50 (188:23–189:15); Perry Depo. at 22 (75:19–20)).  Impact's prior program coordinators (both Caucasian) had established a relationship with Jackson-Olin High School, and when Perry and Day took over they established relationships with Fairfield High Preparatory School and Tarrant High School; all of these schools had high rates of teen pregnancy.  (Day Aff. at ¶ 11).

- Perry was unable to enroll in the retirement program Impact offered to its other employees (Perry Decl. at ¶ 30d).  Day testified this is an opt-in retirement plan that requires an employee to personally contact an outside representative, who then meets with the employee to set up enrollment.  (Day Aff. at ¶¶ 18–19).  Perry admitted she was given the information to contact Impact's third-party retirement plan provider. (Perry Depo. at 24 (82:3–83:11)).  However, Perry testified Casey "refused to give her the information necessary."  (Perry Decl. at ¶ 30d).  She testified that another worker (whose name and race Perry did not state) "said they went through George to directly get that call and it happened."  (Perry Depo. at 23 (83:7–9)).

- Impact's Southside office, where Perry worked, was lesser in quality than Impact's Vestavia office.  (Doc. 12 at ¶ 21; Perry Depo. at 27 (96:3–9)).  The Southside location operated two programs and had fewer employees than the Vestavia location, which operated seven programs; Impact contends resources were allocated based on the needs of each location.  (Casey Depo. at 27–28 (99:17–22, 101:17–18)).  The Vestavia location is also newer.  (Casey Depo. at 28 (101:14–17)).  Impact assigns employees to offices based on criteria other than race, such as the grants they work on and their duties

and needs.  (Day Aff. at ¶ 8).  Perry stated she preferred to be at the Southside location and voluntarily chose to return there after working at the Vestavia location for a short time.  (Day Aff. at ¶ 7).

## 2. Termination[22]

Perry contends she was terminated based on her race.  (Doc. 12 at ¶ 9).  Impact contends it laid her off for failing to return to work.  (Doc. 32 at 10).  Perry testified she did not know of any other employees who had a delay in receiving test results and had "no idea" whether any other employees were ever disciplined for not performing their work.  (Perry Depo. at 20 (66:3–6), 27 (95:9–15)).  Although Impact contends Perry has no comparators for this allegation (doc. 32 at 10), Perry indicates both Brown and Black were allowed to work from home and were not terminated (Perry Decl. at ¶ 26a-b).

## 3. Failure to Promote

Perry contends Impact failed to promote her based on her race and that she was due a promotion because of the additional job duties she had taken on.  (Doc. 12 at ¶ 102, 105).  Perry testified her "job duties and responsibilities exceeded the defined boundaries of the duties and responsibilities associated with [her] written job description and . . . were most similar to those of a Director."  (Perry Decl. at ¶ 39).  When asked whether there was a specific job into which she should have been promoted or whether she simply should have been paid more, Perry responded that she wished she were paid more and should have been made a director.  (Perry Depo. at 29 (103:18–104:1)).  Perry regularly informed Day and Casey that she was seeking advancement and

---

[22] It is not material to the resolution of this motion whether Perry was laid off or terminated. Since the SAC frames this as termination (*see* doc. 12 at ¶ 9i), the undersigned will as well.

17

promotions.  (Perry Decl. at ¶ 40).  However, Perry admitted there were no job openings she felt she should have received, including for a director position.  (Perry Depo. at 38 (139:10–22)).  Perry did not apply for any promotions at Impact.  (Day Aff. at ¶ 16).

### 4. Hostile Work Environment

Perry alleges she was subjected to a racially hostile work environment, largely based on Casey's comments.[23]  These include the following:

- Casey used the term "your people" or a similar phrase to refer to Perry's Cribs for Kids clients.  (Doc. 12 at ¶¶ 21, 28, 46; Perry Depo. at 28–29 (98:5–21, 102:23–103:7)).  Perry did not recall when this comment was made, but testified it was probably in the summer and probably around 2018.[24]  (Perry Depo. at 28 (99:9–12, 99:22–100:7)).  Perry had asked for room availability at Vestavia and Casey responded "Oh, no, you should go over to [Southside] with your people because they are loud and you to [sic] do so much work."  (*Id*. (98:11–22)).  Perry informed Day, who said "Oh, that's just George.  You have to understand sometimes he just doesn't know what to say."  (*Id*. (98:23–99:3)).  Perry believed this was a racial comment.  (*Id*. (99:6–8)).

- Casey would ask African American Impact staff to perform manual labor, such as cleaning or assisting with remodeling of office locations, and he would tell them that

---

[23] The undersigned has sustained Impact's evidentiary objections to some material in Perry's declaration concerning Casey's beliefs and has not considered that material here.

[24] Casey denies making this comment, recalling only that he asked Perry to host Cribs for Kids meetings at the Southside location to avoid disrupting therapy sessions at the Vestavia location.  (Casey Depo. at 50 (190:19–191:4), 52 (200:8–20)).  For summary judgment purposes, the undersigned resolves this dispute in Perry's favor and assumes her account is accurate.

they were required to do the manual labor if they wanted to keep their jobs.  (Perry
Decl. at ¶ 34).

- When Perry had her hair styled in a loc hairstyle sometime between 2016 and 2018,
Casey asked her if she had twigs in her hair.  (Perry Depo. at 28 (100:8–17); Perry Decl.
at ¶ 35).  Perry perceived this as a racially derogatory comment.  (Perry Decl. at ¶ 35).
When Perry discussed the comment with Day, Day stated Casey "does not know any
better."  (*Id.*).

- Perry was told by Day on several occasions that she and other African American
employees would have to "act" a certain way.  (Perry Depo. at 25 (87:18–88:21)).  Perry
testified Day told her that "in our environment that we must, you know, do things
different from our Caucasian workers or counterparts just to make sure that we don't
get anything said because we're always being looked at." [25]  (*Id.*).  Day did not discuss
these topics in Casey's presence.  (Perry Decl. at ¶ 36).  Specifically, Perry testified
that Caucasian workers "would sit, you know, reading books, watching movies and
nothing would be said.  But if they see one of the African American workers walk
through, why don't you have work, why are you not working, what is their schedule."
(*Id.* at 26 (90:12–18)).  Perry was never disciplined or counseled for not doing her job
correctly or told she was not doing her job correctly, and she did not know of any other
person who had been counseled.  (*Id.* at 27 (94:90–95:15)).  Perry testified her "passion
and purpose is to help families and help people . . . [s]o I have always went over and

---

[25] Day denies making these comments.  (Day Aff. at ¶ 14).  For summary judgment
purposes, this dispute is resolved in Perry's favor.

beyond to make sure that I provided a great service and it made an impact on people's lives." (*Id*. (95:3–8)). Perry did not know when the last of these meetings with Day occurred, but Day made similar comments to Perry during the COVID-19 pandemic. (*Id.* at 26–27 (93:15–19, 94:2–11)).

**E. Perry's Allegations of Retaliation**

Perry alleges she was terminated in retaliation for engaging in protected activity. (Doc. 12 at ¶¶ 79–92). This included complaining about the racially hostile work environment, unfair pay, and how Impact spent its grant funds. (*Id.* at ¶¶ 21, 81, 85; Perry Depo. at 34 (123:11–23)).

Perry's complaints regarding the hostile work environment and race discrimination in general are detailed above.[26] There is no evidence in the record supporting complaints of how Impact spent its grant funds. As for Perry's pay, Perry complained to Day that she felt she should have been paid more, and Day relayed these complaints to Casey. (Day Aff. at ¶ 5; Casey Depo. at 30 (109:2–7); Perry Depo. at 11 (30:2–9)). Perry could not recall when she made these complaints, how many times she brought them, or the last time she made a complaint. *(Id.* (30:16–20, 32:1–5)). Perry did not express to Day or Casey that she believed her pay was related to her race or that other Impact employees were paid differently based on their races.[27] (Day Aff. at ¶ 6; Casey Depo. at 30(109:2–12)). Day informed Perry that Impact's nonprofit nature required employees to wear multiple hats. (Day Aff. at ¶ 5). Casey investigated Perry's pay complaints

---

[26] Impact denies any of these complaints occurred. (Doc. 32 at 15–16). As discussed above, for summary judgment purposes this factual dispute is resolved in Perry's favor.

[27] Perry purports to dispute this on the basis that "she was underpaid and . . . she believed race was the primary factor for the differential treatment and underpayment." (*Id.*). However, she points to no evidence in the record that any of her pay-related complaints to Day or Casey referenced her race.

and determined her pay was fair based on Perry's job duties, similar positions within the company,

similar positions within the market, and data from the Department of Labor.[28]  (Casey Depo. at

30–31 (110:5–21, 112:13–113:15), 51 (195:20–196:9)).

### III. Discussion

The argument portion of Perry's brief reads, in its entirety:

Based upon the arguments above in Plaintiff Erika Perry's responses (submitted for clarity) and in direct dispute of Defendant's "undisputed statement of facts", Plaintiff asserts she has established genuine disputes of material fact remain, and thus the Defendant is not entitled to judgment as a matter of law as it relates to the following claims.

Count I - Race Discrimination and Hostile Work Environment pursuant to Title VII and §1981 (intentional and disparate treatment);

Count II - Race Discrimination Failure to Allow Plaintiff to Work from home and failure to pay Plaintiff severance pay pursuant to Title VII and §1981(intentional and disparate treatment);

Count III – Retaliation pursuant to Title VII and §1981;

Count IV – Failure to promote pursuant to Title VII and §1981;

The racial bias has manifested on a continuing ongoing basis to such a degree of severity that it has impacted and altered the terms and conditions of Ms. Perry's employment with Defendant it [sic] at least the ways listed above.

(Doc. 43 at 23–24).  With the exception of the section setting out the legal standard, Perry cites no

authority to support any of her positions.  Furthermore, as discussed above, the facts section of

Perry's brief cites only her declaration as a whole to support the factual disputes she alleges.  *See*

*supra,* n.5.  If this is sufficient to oppose summary judgment, it is only barely so.  Nevertheless,

---

[28] Perry contends she was "woefully underpaid and her pay was not proportional to the value she added to Impact."  (Doc. 43 at 18).  It is not clear which part of Perry's declaration supports this, but neither of these claims is germane to whether Casey conducted an investigation into her pay.

the undersigned will take into account the arguments Perry raises in the facts section of her brief in analyzing her claims.

### A. Counts I, II and IV – Title VII and § 1981 – Disparate Treatment (Race)

Perry includes a mishmash of allegations of intentional race discrimination within these counts.  In Count I, Perry alleges the following were acts of race discrimination: termination (doc. 12 at ¶ 35), unequal job duties and unequal pay based on those job duties (*id.* at ¶¶ 38–40), unequal pay in general (*id.* at ¶¶ 41–44), unequal benefits (*id.* at ¶ 45), and verbal assaults comprising a hostile work environment (*id.* at ¶ 46).  In Count II, Perry asserts the following allegations of race discrimination: failure to allow Perry to work from home (*id.* at ¶¶ 50–68) and failure to pay Perry a severance (*id.* at ¶¶ 69–72).  In Count IV, Perry contends less-qualified Caucasian employees were promoted over her (although she also includes multiple allegations related to other counts).[29] (*Id.* at ¶¶ 93–111).

A Title VII plaintiff asserting a disparate treatment claim must show the defendant acted with discriminatory intent. *Denny v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). "In order to show discriminatory intent, a plaintiff must demonstrate that the decisionmaker selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects on an identifiable group." *Joe's Stone Crab, Inc.*, 220 F.3d at 1273 (internal quotation marks, alterations, and citation omitted). "[T]he analysis of disparate treatment claims under § 1983 is identical to the analysis under Title VII where the facts on which the claims rely are the same."[30] *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008) (citations omitted).

---

[29] Count IV is solely a § 1981 claim.  As noted below, the legal standards are the same.

[30] Section 1981 claims are actionable via 42 U.S.C. § 1983. *See Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 735 (1989).

When a plaintiff bases her disparate treatment claims on circumstantial evidence, the court generally applies the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973).  Under the *McDonall Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action, (3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (citation omitted).  To demonstrate the fourth element of the disparate treatment *prima facie* case, a plaintiff must ordinarily point to comparators who are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1226.  In *Lewis*, the Eleventh Circuit provided a non-exhaustive list of the types of similarities that would "underlie a valid comparison": whether the comparator (1) "engaged in the same basic conduct (or misconduct) as the plaintiff"; (2) was "subject to the same employment policy, guideline, or rule as the plaintiff"; (3) was "ordinarily (although not invariably) . . . under the jurisdiction of the same supervisor as the plaintiff"; and (4) "share[d] the plaintiff's employment or disciplinary history."  *Id.* at 1227–28.

If the plaintiff makes this showing by a preponderance of the evidence, the burden shifts to the defendant employer to show a legitimate, nondiscriminatory reason for its actions. *Id.* at 1221 (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)); *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the defendant makes this showing, the burden shifts back to the plaintiff to "demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination, an obligation that "merges with the [plaintiff's] ultimate burden of persuading the [factfinder] that she has been the victim of intentional discrimination." *Lewis*, 918 F.3d at 1221 (citing *Burdine*, 450 U.S. at 256).  "The inquiry into pretext requires the

court to determine, in view of all the evidence, 'whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered legitimate reasons were not what actually motivated its conduct.'" *Crawford*, 529 F.3d at 976. A pretextual reason is not only one that is false but one that conceals an actual, discriminatory reason. *Brooks v. County Comm'n of Jefferson County, Ala.*, 446 F.3d 1160, 1163 (11th Cir. 2006).

It does not appear to be in dispute that Perry is a member of a protected class (African American). The undersigned considers that fact to be established for the purposes of these counts. Because the undersigned concludes Impact is entitled to summary judgment on all these claims, the undersigned has organized them by the general adverse action Perry alleges.

### 1. Termination

Perry easily meets three of the four elements for her *prima facie* case as to her termination claim. As stated above, she is a member of a protected class, and she clearly suffered an adverse action when she was terminated. As for her qualifications, "[w]here a plaintiff has held a position for a significant period of time, qualification for that position, sufficient to satisfy the test of a *prima facie* case can be inferred." *Pace v. Southern Ry. System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983). That leaves only the fourth element: whether any similarly-situated employee was treated more favorably. Perry has not made this showing.

The thrust of Perry's argument is that she was unfairly terminated because she declined to come back into the office to work. Perry relies on Brown and Black as comparators here, contending both were allowed to work from home and were not fired for failing to return to work. However, Perry has pointed to no evidence showing that either is an appropriate comparator, which is her burden at the *prima facie* case stage of the *McDonall Douglas* framework, *see Lewis*, 918

24

F.3d at 1218.  The only evidence of record that bears on a comparison is that (1) Black had "comparable" duties to Perry (although it is unclear what those duties were) and (2) that Brown was supervised by Hunter (a different supervisor than Perry's, cutting against Brown being similarly situated).  There is *no* evidence concerning (for example) their disciplinary histories, whether they engaged in the same conduct as Perry, or whether Perry and her comparators were subject to the same policies.  The most Perry offers is that they were *permitted* to work from home, but the circumstances under which they were working from home is nearly dispositive of a comparison.  There is no evidence that either declined to return to work when asked (Perry's conduct at issue here) and were nevertheless treated more favorably than Perry by being retained in a work-from-home capacity.  *See, e.g., Jackson v. Bd. of Trustees of Univ. of Alabama,* No. 2:06-CV-04855-HGD, 2008 WL 11375390, at *5 (N.D. Ala. Nov. 18, 2008), *report and recommendation adopted sub nom. Jackson v. Univ. of Alabama at Birmingham Civitan Rsch. Dep't,* No. 2:06-CV-04855-RDP, 2009 WL 10687908 (N.D. Ala. Apr. 3, 2009) (plaintiff who did not return to work after leave expired not similarly situated to proposed comparators who did not do the same); *McDowell v. S. Nuclear Operating Co.*, No. 1:06CV314-CSC, 2007 WL 328952, at *6 (M.D. Ala. Feb. 2, 2007) (plaintiff terminated for failure to return to work not similarly situated to proposed comparator who did not do the same).

Perry's only effort to establish Brown and Black (and, for that matter, any comparator listed below) as appropriate is her assertion that "many of the duties and responsibilities [of the comparators] overlap with" Perry's, which she contends is sufficient to make them comparators for Title VII purposes.  (Doc. 43 at 11).  The standard is not whether comparators have overlapping

duties and responsibilities;[31] it is whether they are "similarly situated in all material respects," *Lewis*, 918 F.3d at 1226. Since Perry cannot point to any comparators similarly situated in all material respects, she has failed to meet her burden to make out a *prima facie* case. Thus, her claim fails. *See Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997). ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present.")

Even if Perry could meet her burden at the *prima facie* case stage, Impact has put forth a legitimate, nondiscriminatory reason why it terminated Perry: she failed to return to work when asked, and Impact elected to terminate her in light of this failure coupled with its budgetary concerns. Perry spends a good deal of time pointing to her justification for not returning to the office (her doctor's note), but the question here is not whether it was appropriate for Impact to lay Perry off as a general matter. "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer. Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [she] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010) (quoting *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)). An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187 (11th Cir. 1984). *See also Chapman*, 229 F.3d at 1030

---

[31] Even though Casey testified Perry's duties were similar to Black's, Perry never actually states what any of the allegedly overlapping duties and responsibilities *are*.

(11th Cir. 2000) ("Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions.") (citation and internal quotation marks omitted).  Perry has put forth no evidence that would support that Impact's rationale for laying her off was (1) false[32] or (2) a pretext for race discrimination.  She has simply done what the authority above supports she may not do: contend Impact should not have required her to return to work.  Therefore, her claim would fail even if she could make out a *prima facie* case.

### 2. Unequal Pay

Perry contends multiple Caucasian coworkers were paid more than she was: Black, Brown, Patton, Crowe, Aiken, Hunter, Hart, and Williams.[33]  (Doc. 12 at ¶ 113).   To establish a *prima facie* pay discrimination case under Title VII, Plaintiff must establish that she held a position "similar to that of a higher paid employee who is not a member of her protected class." *Crawford*, 529 F.3d at 974–75 (citation omitted).  Perry again cannot make out a *prima facie* case because she cannot show any appropriate comparator.  The undisputed evidence is that Aiken, Williams, and Black were paid less than Perry, and there is no evidence to support that Crowe or Patton were paid more than Perry.   Accordingly, none of these proposed comparators were treated more favorably than Perry.

---

[32] The undersigned has sustained Impact's objections to Perry's purported knowledge of its finances, through which Perry sought to establish the falsity of Impact's rationale for terminating her.  Perry's conclusory statements implying Impact could have afforded to retain her in light of other income sources would not establish pretext in any case.  See *Woods v. Cent. Fellowship Christian Academy*, 545 F. App'x 939, 945–46 (11th Cir. 2013) (plaintiff's conclusory statements that employer had other sources of income insufficient to show pretext when employer offered financial motive for plaintiff's termination).

[33] Perry lists Casey as a comparator in her response to Impact's motion (doc. 43 at 12), although he does not appear as a comparator in the complaint.  To the extent Perry intends to allege him as a comparator, he is not an appropriate comparator for the same reason Impact's other directors are not appropriate.

27

Of the remaining proposed comparators, Perry offers conclusory statements that her remaining comparators either "had fewer responsibilities and fewer job duties" than Perry (in the case Brown) or "had fewer or similar responsibilities and duties" than Perry (in the case of Hunter and Hart), but there is no evidence to support these conclusory statements. As noted above, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis*, 432 F.3d at 1326.  Moreover, while Perry testified through her declaration that her "job duties and responsibilities exceeded the defined boundaries of the duties and responsibilities associated with [her] written job description and . . . were most similar to those of a Director," there is no evidence in the record to support what *Perry's* duties and responsibilities were, much less the duties and responsibilities of a director.  The only evidence regarding the latter is Perry's explicit denial that she knows what a director's duties entail beyond generically "supervising."  Finally, the undisputed evidence is that Hart and Brown were paid more than Perry because they had licenses Perry lacked.  Without some explanation for why they are nevertheless similarly situated, Perry cannot make out a *prima facie* case of pay discrimination.

### 3. Unequal Benefits

Perry cannot make out a *prima facie* case of benefits discrimination either.  Her proposed comparators are Crowe, Brown, and Patton.  Perry testified she did not know how much paid leave any of these three took or had available, and Day testified Perry did not in fact receive less paid leave than they did.  Thus, even if Perry could show them to be similarly situated, Perry cannot show any of her proposed comparators were treated more favorably than she was.  Her *prima facie* case therefore fails.

#### 4. Severance

Perry contends Patton and Crowe received severance when they separated from Impact, while she did not.  (Doc. 12 at ¶ 72; Perry Decl. at ¶¶ 26c–d).  The undisputed evidence is that both Patton and Crowe left Impact voluntarily.  In other words, they are not similarly situated because they elected to leave, while Perry was laid off or fired.  There is no other evidence about the circumstances under which either employee resigned, and no record evidence from which the court could otherwise draw a comparison between Perry and Patton or Crowe to show they are similarly situated in all material respects for the purposes of Perry's severance claim.  Accordingly, Perry cannot make out a *prima facie* case as to this claim.

#### 5. Failure to Permit Working from Home

To amount to an adverse employment action, a Title VII plaintiff must show a "serious and material change in the terms, conditions, or privileges of employment." *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001).  The undersigned has reviewed Perry's brief and finds no evidence or argument to support that Impact seriously and materially changed Perry's employment by requiring her to work from the office rather than from home.  Furthermore, as discussed above, there is no evidence in the record from which the undersigned could conclude Perry is similarly situated to her proposed "work from home" comparators, Brown and Black.  Thus, Perry cannot make out a *prima facie* case of discrimination based on this claim.

#### 6. Retirement

It is undisputed that Impact's retirement program is opt-in, so it is not clear (and Perry does not otherwise argue) that she can show it is an adverse employment action for Title VII purposes that she did not receive benefits she did not opt into.  In any case, Perry lacks any comparator for this claim apart from an unnamed worker of unknown race who received information about the

retirement system from Casey.[34]  Accordingly, she cannot make out a *prima facie* case as to her claim of discrimination in retirement benefits.

### 7. Other Conditions of Employment Claims

Perry alleges a variety of other instances of race discrimination, not all of which appear to be independent claims.  Specifically, she contends: (1) she handled more duties than her Caucasian coworkers (doc. 12 at ¶¶ 38, 46, 103); (2) she was unfairly assigned to schools with larger African American populations and/or lower income schools, which received fewer resources than other schools, (*id.* at ¶ 21; Perry Depo. at 35:4–15); and (3) she worked in a lower-quality office than the Vestavia office, where more Caucasian coworkers worked (*id.* at ¶ 21b).

Even if these are intended to be independent claims, none rises to the level of an adverse action.  First, it is unclear what excess duties Perry handled (or even what her primary duties were), so it is impossible to conclude that they seriously and materially altered Perry's employment.  Second, Perry's claim that she as assigned to schools with larger African American populations which received fewer resources is entirely conclusory, and it is unavailing in light of Impact's undisputed explanation that (1) school assignments were based on need and prior relationships (including relationships established by Perry) and (2) the grant funders (not Impact) determined the funding allocated to each program.[35]  Finally, working at the Southside location rather than the Vestavia location does not appear to be an adverse action either, particularly in light of the

---

[34] Even that comparator is problematic, since there is no evidence to support Perry asked Casey to do the same for her.

[35] Perry testified she "faced hostility and retaliation" from Day and others when she complained about the disparity in funding (Perry Decl. at ¶ 30c), but she provided no details about this at all.

evidence indicating Perry expressed a preference for being at the Southside location and voluntarily elected to return there.  None supports a *prima facie* case of race discrimination.

### 8. Failure to Promote

To establish a *prima facie* case for a racially discriminatory failure to promote claim, Perry must show: (1) she belongs to a protected class, (2) she was qualified for and applied for a position that the employer was trying to fill, (3) she was denied the position, and (4) a non-member of the protected class was hired. *Williams v. Waste Mgmt.*, 411 F. App'x 226, 228 (11th Cir. 2011) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1539 n.11 (11th Cir.1997)).  Perry cannot make this showing for several reasons.  First, although Perry testified she told Impact's directors she should have been made a director as well (Perry Depo. at 38–39 (141:19–5)), she has identified no position for which she applied.  Perry also explicitly confirmed that there were no job openings (for director or otherwise) she felt she should have received.  (*Id.* at 38 (139:10–14, 20–22)).  Finally, Perry has not pointed to any comparator employee outside of her protected class who was promoted or otherwise received a director role in favor of her.  Since she has failed to meet her burden to make out a *prima facie* failure to promote case, this claim fails as well.

### 9. Hostile Work Environment

An employee seeking to establish a *prima facie* hostile work environment case must demonstrate that: "(1) [s]he belongs to a protected group; (2) [s]he suffered unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee, such as [race]; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) the employer is responsible for that environment under a theory of either direct liability or vicarious liability."

*Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1153 (11th Cir. 2020) (citing *Miller v. Kenworth of Dothan, Inc.,* 277 F.3d 1269, 1275 (11th Cir. 2002)).

To show the severity of the harassment, a plaintiff must point to evidence showing that her workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). This contains both a subjective and an objective element. *Fernandez*, 961 F.3d at 1153. The employee must first establish that she "subjectively perceive[d] the environment to be abusive." *Harris*, 510 U.S. at 21. As to the objective element, she must show that the environment is one "that a reasonable person would find hostile or abusive." *Id.* A court assessing the objective element must consider "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza v. Borden*, 195 F.3d 1238, 1246 (11th Cir. 1999). These factors guide the inquiry, but the evidence must be viewed "cumulatively and in the totality of the circumstances." *Fernandez*, 961 F.3d at 1153 (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010)).

Perry identifies five discrete acts she says constituted the hostile work environment: (1) Casey's comments about "your people" in roughly 2018; (2) Impact required African American employees to perform manual labor; (3) Impact asked Perry and other African American employees to help remodel the Vestavia office in 2020 when other employees were working remotely; (4) Casey asked Perry if she had twigs in her hair sometime between 2016 and 2018; and (5) Day told Perry that she and other African American employees would have to "act" a

certain way.  There appears to be no question that Perry subjectively perceived these to be racially motivated, so the question is whether they meet the objective element.  Considering the four *Mendoza* factors and the totality of the circumstances, the undersigned cannot conclude that these amounted to a hostile work environment.[36]

As to the frequency of the conduct, the record supports dates for three of these events: the "your people" comments in 2018, the remodeling in 2020, and Casey's "twigs" comment sometime between 2016 and 2018.  Perry testified that her conversations with Day occurred on several occasions, including during the COVID-19 pandemic.  The manual labor allegations are vague and impossible to place in time.   In other words, there are three discrete events between 2016 and 2020, several conversations with Day including some as late as 2020, and manual labor events of unknown frequency.  This falls short of the frequency the Eleventh Circuit has required for harassment to rise to the level of a pervasively hostile work environment.  For example, in *Mendoza* the Eleventh Circuit found five incidents of harassment over an eleven-month period to be infrequent.[37]  195 F.3d at 1249.  *See also McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008) (two derogatory remarks made directly to plaintiff and two racial epithets not directed at plaintiff over a period of more than two years not frequent); *Fortson v. Carlson*, 618 F. App'x 601, 607 (11th Cir. 2015) (nine racially derogatory comments over two and a half years not frequent enough to support a hostile work environment claim); *Freeman v. City of Riverdale*, 330 F. App'x

---

[36] The undersigned notes Perry does not attempt to analyze the conduct she says creates a hostile work environment under the *Mendoza* factors, despite Impact setting them out in its brief (doc. 32 at 30–31).

[37] The plaintiff in that case also testified that she was followed and stared at on a "constant" basis, but the Eleventh Circuit found those allegations did not rise to the level of harassing conduct in the first place. *Mendoza*, 195 F.3d at 1249.

33

863, 866 (11th Cir. 2009) (eleven incidents of racially derogatory language over a thirteen-year

period too "sporadic and isolated to establish" a hostile work environment). *Cf. Johnson v. Booker*

*T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000) (fifteen separate instances

of harassment over four months was frequent); *Fernandez*, 961 F.3d at 1153 (holding "near-daily"

nationality-based derogatory remarks over two-month period sufficiently frequent); *Smelter v. S.*

*Home Care Servs. Inc.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (eight examples of racist remarks

over a two-month period was frequent). While there is "not simply some magic number of racial

or ethnic insults" that precludes summary judgment, *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d

1269, 1276 (11th Cir. 2002), these cases indicate that the harassment Perry experienced was not

frequent.

Nor was the conduct Perry identifies severe under the second factor. Casey's comments

potentially have innocent explanations, but they may reasonably be interpreted as rude and racially

based. That said, neither comment was severe within the meaning of Title VII. As stated above,

the standard requires an environment "permeated with discriminatory intimidation, ridicule and

insult," not simply where there is the "mere utterance of an . . . epithet." *Harris,* 510 U.S. at 21.

Casey's two comments trafficked in offensive stereotypes, but they were not the type of comments

that could be said to permeate a work environment. There is not enough information in the record

to conclude that the conduct in the manual labor and renovation allegations was severe, and there

is also no evidence to support that Perry herself was asked to perform manual labor outside of her

job description. Perry also does not provide any details concerning the remodeling of the Vestavia

location: what she personally was asked to do, how it fell outside her job description (which, again,

is not part of the record), or whether she even participated in the remodeling after being asked.

Perry's discussions with Day were not precisely examples of an Impact employee harassing her,

but were rather Day communicating her perception of the environment at Impact to Perry. Although Day's perception was of an environment where African American employees were required to be busier and behave more carefully than Caucasian employees to avoid discipline, Perry provides no reason to conclude that Day's communication of this to Perry was severe harassment.

Examining Casey's comments under the third factor, both were offensive utterances rather than physically threatening or humiliating. As with the last factor, the undersigned cannot conclude the manual labor and renovation allegations weigh in Perry's favor as to the third factor because of the absence of any detail concerning these incidents. And, much like the last factor, Day's comments about Impact are difficult to evaluate because they are not actually harassment. That said, Day's comments were not physically threatening to Perry, nor did they direct humiliation at Perry.

Finally, there is no evidence to support that any of the five incidents interfered with Perry's job performance. As noted above, there is no indication that Perry herself participated in remodeling the Vestavia location (even though she was asked to help) or performing manual labor. Casey's comments were offensive, but there is no evidence that they interfered with Perry's job performance. Assuming Perry took Day's comments to heart, Perry's allegations are that Caucasian employees could get away with workplace misconduct that African American employees could not (e.g., reading and watching movies). While it is clearly unfair and inappropriate for employees to commit misconduct without consequence, Perry has provided nothing to support it interferes with another employee's job performance when that employee cannot *also* commit misconduct without consequences. In any event, Perry testified she was never disciplined or counseled and did not know of any other employee who was disciplined.

Furthermore, Perry testified she always did her work based on her "passion and purpose" to help people—not out of fear of discipline or additional scrutiny.  This allegation is simply too tenuous on the factual record before the court to support that it interfered with Perry's job performance.

Taking all of the conduct together, the undersigned cannot conclude its totality supports an actionably hostile work environment.  *See Mendoza,* 195. F.3d at 1246 (directing the court to "examine the conduct in context, not as isolated acts").  Accordingly, Impact is entitled to summary judgment on Perry's hostile work environment claim.

### B. Count III – Title VII and § 1981 – Retaliation[38]

Perry contends Impact paid her less and terminated her in retaliation for her complaints of race discrimination and unequal pay and her insistence that Impact distribute its grant-funded resources in a race-neutral manner.  (Doc. 12 at ¶¶ 81–82, 87–88).[39]  "Under the Opposition Clause of Title VII's anti-retaliation provision, an employee is protected from discrimination if she 'has opposed any practice made an unlawful employment practice by this subchapter.'"  *Anduze v. Fla. Atl. Univ.*, 151 F. App'x 875, 878 (11th Cir. 2005) (citing 42 U.S.C. § 2000e–3(a)).  To make out a *prima facie* case of retaliation, a plaintiff must show that "(1) [s]he engaged in statutorily protected expression, (2) the employer took action that would have been materially adverse to a reasonable employee, and (3) there was some causal relation between the two events."  *Worley v.*

---

[38] The same legal standard applies to retaliation claims under both Title VII and § 1981. *Locascio v. BBDO Atlanta, Inc.*, 56 F. Supp. 3d 1356, 1363 (N.D. Ga. 2014) (citing *Butler v. Ala. Dep't of Transp.*, 536 F.3d 1209, 1215 (11th Cir. 2008); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)).

[39] The undersigned assumes Perry's reference to complaints of "gender discrimination" in Paragraphs 81 and 82 of the SAC are typographical errors, as well as Perry's references to her pay in comparison to her "male counterparts" in Paragraph 87 of the SAC.  There are no apparent facts in the complaint or in the summary judgment record to support gender discrimination.

36

*City of Lilburn*, 408 F. App'x 248, 250 (11th Cir. 2011) (citing *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001)).

To show protected activity under the Opposition Clause, a plaintiff must demonstrate "that [s]he had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). This contains both a subjective and an objective component:

> A plaintiff must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented. It thus is not enough for a plaintiff to allege that his belief in this regard was honest and bona fide; the allegations and record must also indicate that the belief, though perhaps mistaken, was objectively reasonable.

*Id.* An employee alleging she engaged in protected activity must "at the very least, communicate her belief that discrimination is occurring to the employer and cannot rely on the employer to infer that discrimination has occurred." *Demers v. Adams Homes of Nw. Fla., Inc.*, 321 F. App'x 847, 852 (11th Cir. 2009) (citing *Webb v. R & B Holding Co., Inc.*, 992 F. Supp. 1382, 1390 (S.D. Fla. 1998) (internal quotation marks omitted). A retaliation plaintiff must show that the "protected activity was a but-for cause of the alleged adverse action by the employer." *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362 (2013).

Here, Perry again cannot make out a *prima facie* case. First, she cannot show she engaged in protected activity at all with respect to her complaints of pay disparity and how Impact spent its grant funds. There is no evidence in the record to support that Perry communicated in any way to Casey or Day (or any other Impact supervisor or director) that either of these things was connected to discrimination under Title VII. Taking Perry at her word, she *believed* her pay was less because of her race, but it is undisputed that she never communicated that belief to Impact. And Perry does

37

not point to evidence in the record concerning grant fund spending. Therefore, neither of these complaints can support a retaliation claim.

As for Perry's complaints regarding the racially hostile work environment, assuming these are protected activity, the record indicates they occurred when Perry complained to Day after each of Casey's comments. In other words, the latest of these occurred in 2018. Perry has presented no evidence to suggest there was a causal connection between these complaints and her termination, which occurred in July 2020,[40] or to unequal pay over the course of her employment. Accordingly, she cannot make out a *prima facie* claim of retaliation, and Impact is entitled to summary judgment on Perry's Count III.

### IV. Conclusion

For the reasons stated above, Impact is entitled to summary judgment on all of Perry's claims against it, and this case is **DISMISSED WITH PREJUDICE**. A separate order will be entered.

DONE this 11th day of July, 2023.

_____

**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

---

[40] "In the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (observing periods of three and four months are too great to support causation). Perry points to no such evidence to bridge the multi-year gap between her protected activity and her termination.